Our argument is 19-1901 Taylor v. United States. Mr. Dunn. Yes, Your Honor. May it please the court. This case is a takings case involving my clients or our clients, Mr. Ray and I's clients, the Taylors and the United States Air Force in a takings matter. As an initial matter, I would like to describe our argument to the court as flowing through two veins that start when the court of claims essentially fell into what Judge Block of the court of claims in Hanson v. United States, which is 65 Federal Claims 76, described as a Serbonian bog. That Serbonian bog that we fell into in this case runs through two veins, as I said. One is that the court of claims in this matter part parceled the claim into different pieces, which led to this quagmire concerning takings versus counting in tort. The other way that we fell into this bog was that this decision was ultimately premature based upon the development of the factual record. In describing how the Taylors came to end up in the situation, I think this is why we think that the case should be examined holistically. The Taylors, of course, have a ranch in the area of Clovis, New Mexico, close to the Air Force base. After purchasing that ranch, at some point the United States Air Force began flying training routes across the ranch, sometimes very low levels, under 100 feet, very close to being just off the deck. That continued on for quite some time, but didn't really become a real issue and didn't really make the takings in this matter right until the Air Force took the actions to make this permanent. They did that by, and this is where the confusion, I think, of the court between sounding in tort and takings comes to bear. They did this by, in some fashion, and again, because the factual record is not very well developed, we don't know exactly what the Air Force said to the wind energy company. Did something to cause, whether they stepped into the shoes or used coercive force or coercive authority, not force, to cause the wind energy company to cancel the existing wind energy lease and to stop the development of the wind energy project just before it began. Judge O'Malley, the complaint that you filed actually lays out the elements of a tort citing to New Mexico law. How was the court wrong in concluding that at least that portion of your complaint sounded in tort? I think I would, again, refer back to the decision of Judge Block in Hanson v. United States. In that case, Judge Block said that the best that can be said is that not all torts are takings, but not all takings by physical invasion, I'm sorry, but that all takings by physical invasion have their origin in tort law and are types of governmental nuisance or, at times, trespasses. We ultimately are relying on what appears to be tortious interference, and yes, it is pleasantly, because we really don't know what type of authority or how the U.S. Air Force went about this because we haven't had the opportunity to really get into any sort of discovery and talk to the wind energy company about how this came about or to the government about what actions they took. We haven't had that opportunity, so relying on best what we can, we describe what is essentially a tort, but again, this isn't necessarily fatal to these claims. In fact, Justice Thomas recently, in the Nick v. Township of Scott case, in his concurring opinion, said, I do not understand the court's opinion to foreclose the application of remedial principles to takings claims and related common law tort claims such as trespass. This may be sound in both, but that's not necessarily something that's fatal, and that gets to the point that ultimately the court of claims jumped the gun here and was premature in dismissing this case on that premise. I really believe that that's part of this bog, and that's why ultimately we brought up United Nuclear at oral argument and why we've, in our briefing, in this case, now cited to A&E Auto Sales is that we're not quite sure what exactly the government did, but they were conducting low-level overflights with a regular frequency, and in this instance, one a year of regular frequency would be enough to deprive the tailors of the use of their airspace. That's really what was going on. The Air Force is using this airspace. They've got a navigation easement established, and they wanted to make sure that nothing interfered with that navigation easement they'd taken, so they took actions, whatever they might have been, and we don't know yet, to make sure that that remained permanent by making sure that this wind energy project, which was going to interfere with that easement, never came to fruition. We believe that they used their coercive authority, whether it was stepping into the shoes or by giving some sort of quid pro quo to the wind energy company saying, we'll go do this here instead of here, and we won't fight you on it, but ultimately, that's where this no-hazard determination comes in, and that's why we bring that up, is that all we know is that that was mentioned. That's, at this point, somewhat anecdotal. Did you raise the argument below, Counsel? Raise which arguments, Your Honor? I apologize. Did you cite A&D and argue coercion was a possible basis for your claim to the Court of Claims? We argued that they had, we did argue the United case, which is stepping into the shoes. We did argue that they had interfered with the contract in some form or fashion, but again, we didn't raise A&D below. We raised the issue of the fact that the contract had been terminated through some type of action by the government, and like I said, we used the United example. We didn't raise A&D, but we did point out that somehow the government had caused that contract to be terminated, and yes, that was preserved below. This is Judge Taranto. I think your complaint says that wind energy breached the contract. Have you sued wind energy for breach? No. If we did say breach, perhaps that was an article. I think what we said is they terminated the contract. The argument isn't that they didn't correctly terminate the contract. The argument is that they did terminate the contract pursuant to the terms of the contract. I don't think that it was to the level of breach where it was actionable against wind energy. I believe that they did so pursuant to the terms of the contract, which is why we believe that somehow the government stepped in to the shoes of wind energy and said, hey, let's go ahead and exercise this part of the contract, the termination clause, to end the contract. Does your complaint allege insofar as I understand that you have one kind of property that you say has been taken? Is the property consisting of such contract rights as you had under the contract with wind energy? And then the other is your property interest in use of the land free of the overflights, the kind of two separate things. Just on the contract right claim of taking of property, does your complaint say something other than that the FAA's informal indication that there would likely be no certificate of no hazard or determination of no hazard was a cause of this? Or is that the government action, the informal notification that a no hazard determination is likely not going to be given if asked? Is that the sole causal mechanism of the termination of the contract? Yes, Your Honor, that's a very good question. And I'd like to clarify, it's not that the FAA gave some sort of presumption of where this was going. It's just the Air Force said this is not going to be forthcoming. And that's, again, this gets to the point of we don't know for sure how this came about. That's what we understand from the Air Force via my clients that they were told and that wind energy said that the Air Force said this is not going to get its FAA no hazard designation. So we're not going to go forward with this contract because we think it's just going to end up in a regulatory quagmire fighting with the Air Force in order to try to get this no hazards determination that will never come to pass. And that caused, ultimately, the loss of the contract, which is, the contract is for the use of that airspace that makes up the avigation easement that the Air Force is using that would have been used for a wind energy project that they were being paid lease payments for. And that if the project had come to fruition, they would have been paid, of course, the royalty rates for the use of that avigation easement airspace for wind turbines. And do you have an allegation or a position on whether the Air Force had authority, was acting in an authorized way to tell wind energy what the likely FAA action might be? No, that gets to our point. I don't think that they have authority over the FAA and that we're using their coercive authority to point out that they would make sure that the FAA didn't do that. We would use the power of government. And if the court doesn't have any immediate questions for me, I would reserve the remainder of the time for Mr. Ray. I have one last question. This is Judge O'Malley. Did anyone ever actually ask the FAA? Not to my knowledge, Your Honor. Okay. Okay. Mr. Yale. Thank you, Your Honor, and may it please the court. To respond to a few of the issues that were raised, on the regulatory takings claim, the distinction and sort of the conflict that Mr. Dunn has brought up, the two cases that supposedly pose a conflict between the trial court's decision and what they're raising here on appeal, those cases were not raised below. And coercion is not in this complaint either. It just simply isn't. And so the notion that somehow the trial court erred by not considering a theory. Mr. Yale, I'm afraid I'm not much taken with the idea that you can't cite new cases in support of the same idea. So what idea is it that you think was waived? Well, the idea of coercion, the argument that there was coercive conduct here, the only time that that was actually mentioned, unlike in A&D where it's actually pled in those complaints, was in a brief where there was an allegation in the brief upon information and belief. But you're not pleading factual allegations in a brief. And so none of the... was whether or not monetary inducements to those car dealers would potentially be the basis for a coercion claim. I mean, there's no conduct here that they have pointed to. There's no government action, which you need for a takings claim to actually be the basis for either a coercion claim under A&D or just a normal takings claim. So all we have is this informal indication, which has been pled, that factual allegation. And why as a matter of law should the informal indication, whether it came from the FAA or from the Air Force, not be amenable to being a takings, a taking under Penn Central? Well, because those are the cases that we cited to in our brief, Flowers Mills and Brenneman and... Right. Those are not cases from our court. So they're not binding precedent. They're not binding precedent. But Damari Fresh is a case that is binding and it examined those cases. And I stand for the proposition that when we're talking about whether or not a takings claim can be based in the taking being the inability to construct essentially a wind turbine on property, the construction of that, whether or not that can be based on an FAA no hazard determination. And this case is so far removed from that because it just was acknowledged by Mr. Dunn. They haven't even pointed to anything where they've actually talked to the FAA. They certainly didn't submit anything to the FAA to get a no hazard determination. And so how informal statements can be the basis based upon what's at least persuasive authority cannot be the basis for a taking. We don't think that the trial court erred in reaching that conclusion. And frankly, that was not challenged below. It's not even been challenged here. I'm sorry, what was not challenged? Our argument that the government action of denying a no hazard determination. I'm sorry, that's not the alleged action. The alleged action is an indication that if requested a no hazard determination would not issue whether that indication came from the Air Force or from the FAA. Well, that's even less of a government action. Well, why is that? Why is this a kind of lesser included? I mean, as I understand the complaint, they say the action is somebody, the Air Force or the FAA, I guess it's now the Air Force, said we will do what we need to or we do not think that there will be a no hazard determination coming out. And they told Wind Energy that and Wind Energy exercised what I guess we're now told, contrary to the complaint, is it's right under the contract simply to terminate. Notwithstanding that the complaint says that this was a breach. And at that point, the harm as to the contract is fully over and done, complete. It doesn't matter anymore what might happen if a formal proceeding in the FAA went forward. Why is that action not amenable to a Penn Central three-factor analysis? Well, I mean, we think the authorities that we cited covered that. But also, when we're talking about the contract itself, I mean, the ability to obtain permits and all of that, I mean, that's part of whatever contract that is. And that's sort of getting into property interest argument of whether you even have a property interest and having some contract be that for whatever reason that they're not going to issue the permit. But here, I mean, we haven't, I mean, how is this right? How has there been any final decision from the FAA? Well, let me just ask about that. I must say, I'm not entirely skeptical of the idea that if you did a Penn Central analysis on what the actual claim is here that it, in fact, might not succeed as a and the fact that there is no apparent impediment to wind energy walking away. But I'm not sure that that analysis has been done. But as to rightness, the rightness cases are about the situation where the harm has not yet been determined and is not complete. And you can't figure out whether until some further action is taken, what harm there will be. That's not this complete over nothing. There is no new information. And so the only question is whether the government action that is alleged to have triggered that complete harm is actionable. I don't understand the rightness point. Well, I mean, the first point is whether or not, I mean, with regards to construction of the wind there's the FAA no hazard determinations, whether or not those actually, the government is authorized in preventing construction. And so with, we would agree to the extent that, I mean, if there's this, you know, if there's sort of a situation, you know, where there actually had been a no hazard determination, we don't think that that's authorized conduct to prevent construction. But here, what is the authorized conduct here that's been alleged? There's an informal communication from the Air Force who is not even the ones who decide this. So if for the same reasoning about the authorization for a government action to support a takings claim, we think that frankly is even stronger because... I don't remember. I mean, in thinking about the case, it did occur to me to think about a line of authority that goes back a long way from Del Rio and other cases that say one defense to a takings claim is that the government action that is cited as causing the harm was not actually authorized. And it may well be that we heard that this morning. Is that in your brief? Well, that case is not in our brief, but part of that is because we argued that the no hazard determination is not authorized. And plaintiffs below and here have never argued against that point. So we had no reason to make the point about the informal communication, frankly. Can I switch topics and just ask you about what I think was both the lead argument here and the lead point in the CFC that this is a tort and therefore can't be a taking. If the government comes in and with authority takes my car and takes it away, that's both a conversion and a taking, right? A tort conversion and a taking. And why is it that the same government action cannot be both? Well, I mean, I think it depends on whether or not that's a taking or not. I mean, if it sees pursuant to police power, something like that, it's likely not going to implicate the taking's cause. There can be state law conversion claims that can be made. But part of it is at some point, words have to matter. And at some point, what is pled needs to actually matter. And I don't think that really, when you look at the plain language of this complaint, that you could interpret, you could find error in the trial court's interpretation of what is pled here. So is there some sort of factual situation where your car, you know, if the government came in and, you know, seized the car or something under a factual situation, I mean, it may not implicate the taking's cause. It may be a conversion under state law. Could there be a factual situation if it was properly pled where there could be a taking claim? It may be that case, but that's not, I mean, that's not, if you go into court and you plead as a tortious interference with contract claim, then the trial court is perfectly within their authority. And it's not error to find that that is not within this court's jurisdiction. Counsel, before you sit down, I have a question. One of the things that in the Court of Claims opinion, you referenced this heightened pleading standard for abrogation-based taking claims. And I looked at the cases that you cite for that, and other than the Court of Claims itself, the cases you cite don't stand for that proposition. They stand for the proposition that you have to have a certain quantum of activity in order to prove such a claim, but nowhere do we or the Supreme Court ever say that there's a heightened pleading requirement. Well, what that's referring to is in general, you know, when you have a physical taking, one, you know, if you go on for a certain period of time, for example, it's automatically going to be a per se taking, but abrogation easements are its own, you know, it's been deemed a physical taking, but it's its own area of the law where there's certain elements that you have to plead. Frequency is one that we've pointed to. And so, it's... Yeah, but you're arguing that you have to plead a certain precise detail with respect to frequency, and I don't think that that would be an appropriate requirement at the pleading stage. Well, respectfully, what we pointed to and what the trial court pointed to was Twombly and Iqbal. And what the trial court said was they're just parroting back the word regularly. I mean, we pointed to the fact that just going in and saying these happen frequently is not sufficient, because when what we're talking about in general with when there is viability, when you get to that stage, it's definitely the case that these are not just once a year. I mean, when you're talking about that, we're talking about very sporadic, you know, very sporadic overflights. And so, we think that that's just the normal, you know, pleading legal conclusions or the exact element of the claim is not sufficient. And we think that that's a straightforward application of Iqbal and Twombly. There really isn't any dispute that we're not talking about once a year, right? Well, I mean, frankly, until the oral argument where the number of 3 to 15 was thrown out, we didn't have any idea what they were talking about. Because it's not as if these, it's not as if there's an actual marked training route that flies over their property. So, what we're talking about would have to be flights that go essentially where they're not supposed to. So, you know, whether or not it's 1 or 10,000, that makes a big difference. And it makes a big difference in terms of how it's being pledged. I mean, it regularly could mean, you know, on the dot, once every four years, there could be one flight. Now, at oral argument, there was mentioned three, you know, maybe three a year, which we certainly don't think would constitute an abrogation easement. But we do think that that's an element that needs to actually be pledged other than the statement that the flights were frequent. And... Can I just ask a question? I had understood you to be making two points about the insufficiency of the pleading as a matter of law. One was insufficiency as to frequency, but the other was the absence of an allegation that whatever the frequency was, it deprived the tailors of the, you know, use and enjoyment of the land, which is also part of the Cosby claim. Am I right that you're making... That's correct. But that, I mean, that wasn't, you know, I don't think that the trial court specifically reached its decision on that grounds. But, you know, on appeal, certainly that is, you know, we have made that issue. You know, we have, we argued it below and we continue to believe that's the case. Any other questions from the judges? All right. Thank you, Mr. Yale. We'll turn to Mr. Ray for five minutes of rebuttal. Your honors, can you hear me okay? Yes. Excellent. Well, first I would like to just add to the colloquy that the court just had about the pleading standards under Twombly and Iqbal. When the government is talking about the Cosby claims, it's focusing on the degree when that's really not an issue here. So, in those abrogation easement claims that they're talking about like Cosby, the idea is that there are flyovers happening so often that it's making the land not amenable to its use or enjoyment. I think in Cosby, it was causing the chickens to die or animals to panic on the property on a regular basis. But what is pled in the complaint here, and this isn't a legal conclusion, is that there are regular or frequent flyovers in a space that this landowner contemplates physically occupying himself with buildings that would preclude any more flyovers. It is our understanding that there is a marked training route through there and the government knows exactly how many flyovers happen in that training route and they just won't tell us and we don't get to do discovery because we've been at the pleading stage. So, from a standpoint of pleading, we don't need to plead that they fly over 10 times a year or once every five years because if the government insists on flying a plane once every two years or once every year, you know, every now and then it needs to fly its planes in that training route, then our client can't enter into contracts for energy extraction or wind turbines that the Air Force wants to fly in. Can you just point me, what are the paragraphs in the complaint that tie the overflight allegations to a harm to the potential building of windmills? Well, Judge, we're pulling that up right now, my co-counsel is, but where we say conduct regular flyovers, the inference that can be validly drawn under Rule 8 and under Rule 12 in favor of the non-moving party is that that sentence means that if the planes are flying over, they can't build there, Your Honor, and so I apologize that I don't have the paragraphs of the complaint right in front of me right now, although if the court would refer to paragraph 14 and to paragraph 15, I think that that will help illuminate the situation. Now, and I will, if the court doesn't mind, I'm going to, I want to move on because my time is short to the other point that was being discussed, which is this idea of coercion with respect to the third part, the contract between the private parties, which was tanked by government action and whether the government action was actionable. A really important case, which interestingly is also arising out of energy extraction in New Mexico, was the United Nuclear case, and United Nuclear, I think, is very instructive here on that point because in United Nuclear, you had this company, the United Nuclear Corporation, it had two leases with the Navajo Tribal Council to conduct uranium mining operations in Grants, New Mexico. The Department of the Interior came in and approved those leases, and so the company starts doing exploration and doing the legwork and finds uranium. Well, then all of a sudden, United Nuclear submits its plans for approval to the Secretary of the Interior, and the Secretary of the Interior turns around and says, it's going to withhold approval until the Tribal Council approves it, and that just was never forthcoming for three years, I think. And in that situation, this court found that the taking had occurred because the Secretary had essentially interfered with the contract between United Nuclear and the Tribal Council by colluding with the Tribal Council to keep allowing them to not grant the approval for the uranium extraction. Here, we're sort of talking about some analogies. You have a landowner who has contracts with a private company to do another type of energy extraction, and the government comes in and doesn't take maybe a formal action, and we don't know if what the Air Force was telling the company was authorized or not, but that's something that's not appropriately dealt with at the pleading stage. It's something to be dealt with through evidence and maybe on summary judgment, but those conversations between the wind development company and another government agency, the Air Force, and potential conversations between the Air Force and FAA, which are implied in that allegation, are exactly like what happened in United Nuclear. You have these entities that are tied to the Department of the Interior in United Nuclear and the Navajo Tribe that are basically shutting this project down, and in our case, you have the Air Force saying to a private company, you're never going to get this project off the ground. It's dead because the FAA is not going to do that no-hazard determination because we fly over that property, and we intend to continue to do so. I'm out of time, judges. If you have any questions, I stand. Thank you. We thank both sides, and the case is submitted. That concludes our oral argument proceeding for this morning. Thank you. The honorable court is adjourned until tomorrow morning at 10 a.m.